## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STEVEN N. KENDALL, | |
| Plaintiff, | |
| v. | Civil Action No. 18-10141-PBS |
| BUREAU OF PRISONS; | **JURY TRIAL DEMANDED** |
| STEPHEN SPAULDING, Warden at FMC Devens; | |
| SCOTT MURRAY, M.D., General Practitioner at FMC Devens; | |
| BERHAN YEH, M.D., Medical Officer and Clinical Director at FMC Devens; | |
| PHILLIP KAPATOS, Physical Therapist at FMC Devens; | |
| PAUL ANDERSON, Chief Physical Therapist at FMC Devens; | |
| SUSAN COUCH, Nurse at FMC Devens; | |
| A. FLETE, Correctional Officer at FMC Devens; | |
| DAVID TAYLOR, Special Investigative Agent at FMC Devens; and, | |
| WILLIAM TIDWELL, Correctional Counselor at FMC Devens; | |
| Defendants. | |

## FIRST AMENDED COMPLAINT

## I.      PRELIMINARY STATEMENT

Plaintiff Steven N. Kendall is a 63-year-old inmate at FMC Devens who suffers from severe gastrointestinal issues that required removal of his large intestine and placement of a Kock Pouch, which is a surgically created continent ileostomy that replaced Mr. Kendall's lower intestines.  Mr. Kendall also suffers from numerous physical ailments including a left leg amputation, torn quadriceps tendon in his right leg, and severe arthritis in several joints. Mr. Kendall's physical ailments result in significant ambulatory issues.

Prior to his incarceration at FMC Devens, Mr. Kendall's treating gastroenterologist and orthopedic surgeon expressed concerns regarding FMC Devens' ability to properly care for Mr. Kendall's unique medical conditions.   Specifically, Dr. Jonathan McCone, his long-time gastroenterologist, believed that "his medical condition does not allow a safe transfer to Devens prison," fearing that improper treatment could "lead to disaster."  Mr. Kendall's orthopedic surgeon, Dr. John Bruno, shared these concerns with the sentencing judge, worrying that the medical facilities would not be equipped to handle Mr. Kendall, a patient with "extremely severe permanent disabling conditions."  Despite these concerns, Mr. Kendall was sentenced to serve his prison sentence at FMC Devens.

Since arriving at FMC Devens, these fears have become a reality. The medical staff has failed to adequately treat Mr. Kendall and, as Mr. Kendall's condition worsened, has refused to consult a specialist regarding the outdated and scarcely-seen medical peculiarities that plague him such as his Kock Pouch. When Mr. Kendall voiced his concerns over the lack of adequate medical care, the staff at FMC Devens responded by stripping his privileges, placing him in non-handicap quarters, and physically assaulting him.  By this lawsuit, Mr. Kendall seeks injunctive relief and damages to remedy the Defendants' deprivation of his Constitutional and statutory rights.

## II.    PARTIES

1.      Plaintiff Steven N. Kendall is a prisoner incarcerated at Federal Medical Center, Devens ("FMC Devens"). Mr. Kendall has extensive medical issues involving his gastrointestinal tract, which led to the replacement of his lower intestine with a Kock Pouch. Mr. Kendall also suffers from ambulatory issues stemming from an amputated left leg, right knee replacement, and torn right quadriceps tendon.

2.      Defendant Bureau of Prisons ("BOP") is a federal law enforcement agency responsible for oversight and care of federal prisoners. It is a "public entity" within the meaning of the Americans with Disabilities Act, *see* 42 U.S.C. § 12131(1)(B), and receives federal funding within the meaning of the Rehabilitation Act, *see* 29 U.S.C. § 794.

3.      Defendant Stephen Spaulding is and was at all times relevant to this action the Warden of FMC Devens. He is responsible for discipline related to employee misconduct; for the supervision and oversight of all movement of prisoners, staff, and administration of the prison; for the maintenance of all inmate records, policies and procedures; and for scheduling inmates' medical appointments. His regular place of business is FMC Devens, 42 Patton Road, Devens, MA 01434. Defendant Spaulding, as Warden of FMC Devens, has ultimate oversight authority and responsibility over all persons working at FMC Devens and is ultimately responsible for all violations of Mr. Kendall's rights, whether constitutional or statutory.

4.      Defendant Scott Murray, M.D., is and was at all times relevant to this action Mr. Kendall's treating primary care physician at FMC Devens. He is directly responsible for providing adequate medical care to FMC Devens inmates, including Mr. Kendall; organizing treatment with institutional staff and consultants; completing physical examinations and ordering appropriate diagnostic testing; and referring cases to consultant specialists when necessary. His regular place of business is FMC Devens, 42 Patton Road, Devens, MA 01434.

5. Defendant Berhan Yeh, M.D., is and was at all times relevant to this action the Medical Officer and Clinic Director at FMC Devens. He is responsible for ensuring that all prisoners at FMC Devens receive adequate medical care by implementing appropriate treatment plans, medical restrictions, and accommodations; for ensuring inmate medical care is appropriate, accurate, and received in a timely manner and in compliance with relevant standards of care; applying ethical and legal principles when providing inmates with medical care by supervising and evaluating medical services for inmates; and for monitoring records of medical practices in the system, including timeliness and accuracy of medical records and inmate care practices. His regular place of business is FMC Devens, 42 Patton Road, Devens, MA 01434.

6. Defendant Phillip Kapatos, P.T., is and was at all times relevant to this action a Physical Therapist at FMC Devens. Defendant Kapatos is directly responsible for treating the disabilities, injuries, and diseases of inmates; for diagnosing illnesses and injuries; and for rehabilitating inmates. His regular place of business is FMC Devens, 42 Patton Road, Devens, MA 01434.

7. Defendant Paul Anderson, P.T., is and was at all times relevant to this action a Physical Therapist at FMC Devens. Defendant Anderson is directly responsible for treating the disabilities, injuries, and diseases of inmates; for diagnosing illnesses and injuries; and for rehabilitating inmates. His regular place of business is FMC Devens, 42 Patton Road, Devens, MA 01434.

8. Defendant Susan Couch is and was at all times relevant to this action a Nurse at FMC Devens. Ms. Couch is directly responsible for assessing and managing patients' chronic health problems; for counseling and educating patients on their illnesses; and for making patient

management decisions in collaboration with physicians. Her regular place of business is FMC Devens, 42 Patton Road, Devens, MA 01434.

9.      Defendant A. Flete is and was at all times relevant to this action a Correctional Officer at FMC Devens. Mr. Flete is directly responsible for supervising inmates; for enforcing the rules and regulations of the facility; for conducting regular searches for contraband and disciplining inmates; and for controlling movement in and out of prison units. His regular place of business is FMC Devens, 42 Patton Road, Devens, MA 01434.

10.     Defendant David Taylor is and was at all times relevant to this action the Special Investigative Agent at BOP. Mr. Taylor is directly responsible for conducting investigations of staff and inmate misconduct by maintaining evidence, conducting research, and preparing reports on incidents; for serving as the law enforcement liaison for the institution; and for maintaining administrative files on staff and inmates. His regular place of business is FMC Devens, 42 Patton Road, Devens, MA 01434.

11.     Defendant William Tidwell is and was at all times relevant to this action the Correctional Counselor at FMC Devens. Mr. Tidwell is directly responsible for providing counseling and guidance on institutional adjustments, personal difficulties, and future planning to unit inmates; for conducting group counseling sessions; for visiting and supervising inmate work assignments; and for being the point of contact for inmates' day-to-day problems. His regular place of business is FMC Devens, 42 Patton Road, Devens, MA 01434.

### III.     JURISDICTION AND VENUE

12.     This Court has jurisdiction of Plaintiffs' federal law claims, pursuant to 28 U.S.C. § 1331, and supplemental jurisdiction over the related state law claims, pursuant to 28 U.S.C. § 1367.

13.     Venue is proper pursuant to 28 U.S.C. § 1391(b).

## IV.     FACTS

### A.     Overview

#### i.     Mr. Kendall's Health Prior to Arriving at FMC Devens

14.     In or around 1980, Mr. Kendall underwent experimental surgery and was fitted with a Kock Pouch ("K-Pouch"). A K-Pouch is a form of continent ileostomy where a patient's lower intestine is refashioned into a reservoir. The reservoir holds the patient's waste and can be accessed through an opening in the stomach, called the "stoma." Between the stoma and reservoir sits a one-way valve, which prevents leakage. Throughout the day, the patient must empty the reservoir using a drain catheter.

15.     In 2005, Mr. Kendall's right knee was replaced.

16.     In or around 2008, Mr. Kendall's left leg was amputated below the knee. He now uses a prosthetic.

17.     In 2014, Mr. Kendall's treating gastroenterologist, Dr. Jonathon McCone, informed Mr. Kendall that he would need surgery to revise the valve in his K-Pouch. However, because K-Pouches are not, and never were, a common form of treatment, Dr. McCone was unable to locate a surgeon competent to perform the operation.

18.     In or around 2016, Dr. McCone found a colorectal surgeon qualified to operate on Mr. Kendall's K-Pouch to correct the aforementioned issues with the K-Pouch valve. During pre-surgery tests, however, Mr. Kendall developed pulmonary embolisms and was unable to proceed with the valve revision.

19.     Following the removal of the pulmonary embolisms, Mr. Kendall was sent to physical therapy, where he relearned to walk. After gaining proficiency with a walker, Mr. Kendall was instructed by the rehabilitation facility to use a cane henceforth.

20.     On September 2, 2016, Mr. Kendall was sentenced to 26 months in federal prison. Both Dr. McCone and Mr. Kendall's orthopedic surgeon, Dr. John Bruno, filed letters to the trial court stating that FMC Devens would be unable to properly care for Mr. Kendall due to his significant medical issues. The sentencing judge suspended Mr. Kendall's sentence for one year, in order to allow for necessary surgeries before incarceration.

21.     In February 2017, Mr. Kendall tore his right quadriceps and scheduled surgery to repair it. Due to complications, this surgery was also delayed.

22.     Ultimately, on April 12, 2017, before his muscle could be repaired or his K-Pouch valve revised, Mr. Kendall was taken to FMC Devens.

**B.     FMC Devens' Inability to Provide Adequate Care for Mr. Kendall's K-Pouch**

23.     Mr. Kendall arrived at FMC Devens with an ulcer in the side of his K-Pouch, which requires regular steroid treatments.

24.     Mr. Kendall also requires regular doses of blood thinners, to protect against pulmonary embolisms.  In or around June of 2017, doctors at FMC Devens injected the blood thinner Lovenox into Mr. Kendall's abdomen. These injections caused a hematoma to form above the stoma of Mr. Kendall's K-Pouch.

25.     Mr. Kendall was taken to UMass Memorial Medical Center to receive a second opinion.  He was seen by a general surgeon who lacked medical training in colorectal conditions and had no experience with K-Pouches or other continent ileostomies.  Mr. Kendall was informed that the medical staff at UMass would be unable to fix any surgical mistakes that affected the K-

Pouch. Due to the life-threatening risk posed by undergoing surgery performed by doctors who had no medical expertise to treat any complication that may arise during the surgery due to the K-Pouch, Mr. Kendall declined the surgery.

26.     Since then, the hematoma has dropped lower in his abdomen. Although shrunken in size, the hematoma now presses against, and partially constricts, Mr. Kendall's K-Pouch's stoma, making it extremely painful and difficult to insert a catheter and drain the waste within the reservoir.

27.     Mr. Kendall is currently assigned to a single-cell non-handicapped room that has a toilet without handrails and is too low to the ground to meet Mr. Kendall's needs related to maintaining his K-Pouch.

28.     Proper maintenance and care of a K-Pouch requires one to sit over a toilet and nearby a sink that can dispense hot water in order to safely and sanitarily dispose of the waste. Due to Defendants' inadequate attention and care of Mr. Kendall's hematoma, he is forced to lie down on a bed when inserting the catheter, rather than sit on a toilet because the hematoma is interfering with his ability to access the stoma while sitting upright. This prevents him from seeing where he places the drain catheter, which creates the risk that he may inadvertently puncture the walls of his K-Pouch and result in life-threatening complications.  Further, because Mr. Kendall has not been provided access to a handicapped bathroom where a sink is within arm's reach of the toilet, after insertion, he must either plug the open end of the catheter while navigating to a toilet, or drain his waste into a nearby bucket. Mr. Kendall performs this task every morning.

29.     Mr. Kendall has access to a handicapped toilet across the hallway from his cell but it can only be used by Mr. Kendall when his K-Pouch is not full, because if the K-Pouch were full

he would need to lay on the bed to insert the drain catheter as described above. This toilet is therefore of little utility to Mr. Kendall.

30.     In addition to the potentially unsanitary problems this situation may cause, it places Mr. Kendall at risk of falling and injuring himself due to his physical limitations. Indeed, on at least one occasion, Mr. Kendall fell and injured his right elbow.  Moreover, Mr. Kendall has been placed in cells that do not have sufficiently hot water as the water in his cells is lukewarm at best. The lack of hot water limits his ability to properly clean his catheter and greatly increases the risk of serious infection.

31.     Beginning on July 5, 2018, without providing any medical explanation, Dr. Murray ordered Mr. Kendall to come into his office once a week immediately after lunch to drain the K-Pouch. Mr. Kendall is forced to lie down on the bed in the exam room, in the same manner described above. But because Mr. Kendall already needs to drain his K-Pouch in the morning, and his lunch has barely digested, there is no waste to drain from the K-Pouch. Mr. Kendall has informed Dr. Murray that this unnecessary drainage exposes him to the risk of inadvertently puncturing his K-Pouch.

32.     These difficulties also result in Mr. Kendall's inability to empty his K-Pouch with sufficient frequency, causing pressure to build within the K-Pouch. This pressure could release past the valve or through the pouch's walls, which are already weakened from the ulcer, which could result in Mr. Kendall's waste seeping into other parts of his body.

### C.     Ambulatory Issues at FMC Devens

33.     In or around January 2018, Mr. Kendall broke his prosthetic and requested that a new prosthetic or a hinged brace, both of which he had originally brought with him to FMC Devens when he arrived to serve his sentence, be provided to him. Medical staff, at the direction of

Defendants Kapataos and Anderson, refused this request and claimed that the prosthetic and/or brace had been misplaced.  Mr. Kendall filed grievances against Defendants Kapatos and Anderson asking for reconsideration.

34.     Shortly thereafter, Defendant Kapatos took Mr. Kendall's cane, wheelchair, and extendable arm from him.

35.     Starting in or around January 2018 through the present, Mr. Kendall continued to ask Defendants Kapatos and Anderson for a cane in order to assist with his ability to ambulate. Instead, Defendants Kapatos and Anderson relayed that they could provide Mr. Kendall with a hinged brace.  The brace they provided Mr. Kendall, however, was not hinged and instead limited his mobility.

36.     On May 23, 2018, following a videoconference hearing in front of Judge Saris of the United States District Court for the District of Massachusetts where Mr. Kendall testified that he was struck in the face by Defendant Flete, Defendants retaliated against Mr. Kendall and confined him to the SHU, where he remained until approximately two hours after the June 29, 2018, hearing in front of Judge Saris. Further details regarding this incident are described below. The SHU is not handicap accessible. Mr. Kendall had also been placed in the SHU earlier in April for an unspecified amount of time.

37.     While in the SHU and without the assistance of his cane, Mr. Kendall fell multiple times. One such fall resulted in a broken right elbow and olecranon bursitis, which is an inflammation behind the elbow.  Mr. Kendall has unsuccessfully sought treatment for his injured elbow.  P.A. Cooke, a physical therapist at FMC Devens, examined Mr. Kendall and identified that he had a broken elbow and ordered that Mr. Kendall obtain an x-ray examination.  However, when FMC Devens personnel came to retrieve Mr. Kendall for the x-ray examination, they

required him to place his hands through the cell door to place handcuffs on him.  Due to the broken elbow and severe pain, he was unable to extend his arms.  Instead of assisting Mr. Kendall, who was clearly injured, FMC Devens personnel recorded on file that Mr. Kendall denied treatment.

38.    To date, Defendants Anderson, Kapatos, Murray, Yeh, and Couch have failed to provide the appropriate medical device to help Mr. Kendall safely ambulate. They have represented they would provide Mr. Kendall with a custom, hinged brace for his right knee, but instead have provided him with a straight, non-hinged brace.  Upon information and belief, Defendant Anderson knew at least as early as January 2018 that FMC Devens would not, in fact, provide Mr. Kendall with a hinged brace.  Despite this knowledge in January 2018, FMC Devens medical staff waited until on or about July 10, 2018, to provide Mr. Kendall with an adequate substitute of a cane and a rolling walker.  Instead, prior to receiving the cane, Mr. Kendall was forced to use a wheelchair and bend over when he used it as a walker.  For his over six-foot frame, this forced him to slouch over, which has resulted in significant back pain and potential spinal damage.  This near six-month delay also caused Mr. Kendall to develop kyphosis of the spine (i.e., a curved back) and which has resulted in at least four falls.

39.    Mr. Kendall repeatedly asked to obtain his custom hinged brace, his new prosthesis that he brought with him when originally arriving at FMC Devens, and a cane. Defendants Anderson, Kapatos, Murray, Yeh, and Couch refused these requests until on or about June 15, 2018, when they finally provided Mr. Kendall his new prosthesis and provided him with a cane and rolling walker nearly a month later on or about July 10, 2018. .

## V.    UNCONSTITUTIONAL MEDICAL CARE AT FMC DEVENS

40.    The K-Pouch procedure is an outdated and experimental procedure.  Therefore, the treatment of K-Pouch complications is not well known or understood throughout the general

medical community, and requires specialist attention. Mr. Kendall's K-Pouch is currently affected by at least the following medical conditions:

a)      A faulty valve, which has needed revision since 2014;

b)      A hematoma pressing on the stoma;

c)      Potential internal bleeding around the K-Pouch wall; and

d)      An ulcer, located on the side of the K-Pouch.

41.     Medical staff at FMC Devens, namely Dr. Murray and Dr. Yeh, have insufficient experience and training in caring for patients with K-Pouches, which require oversight by a specialists who are trained in the field; namely, a gastroenterologist, colorectal specialist, and/or radiologist.  Both Drs. Murray and Yeh, however, are emergency physicians with no medical expertise in those fields.

42.     Although Dr. Murray and Dr. Yeh obtained a second opinion regarding Mr. Kendall's hematoma, they did not seek the services of a colorectal surgeon, or any other physician with K-Pouch experience.  Rather, Mr. Kendall has only been examined once by general surgeon a month after the hematoma started forming in June 2017. Since Mr. Kendall began experiencing interference between the hematoma and stoma, however, neither Dr. Murray nor Dr. Yeh have sought the services of an outside physician—of any sort—to address the hematoma and related K-Pouch issues.

43.     Because of the rarity of the K-Pouch procedure, and the severe adverse effects of improper treatment, adequate treatment of Mr. Kendall's condition requires consultation with specialists familiar with his specific medical needs. As a direct and foreseeable consequence of Defendants' deliberate indifference to these needs, Mr. Kendall has been deprived of minimally adequate health care during his incarceration.

44.     Examples of Defendants' deliberate indifference to this minimally adequate care include the following:

a)      Failing to consult a gastroenterologist and/or colorectal surgeon regarding the treatment of Mr. Kendall's hematoma;

b)      Failing to consult a gastroenterologist and/or colorectal surgeon  regarding the interference with Mr. Kendall's K-Pouch stoma, caused by his hematoma; and

c)      Mr. Kendall's confinement to a non-handicapped cell and/or lack of access to a handicapped bathroom adequate to meet the needs of his K-Pouch maintenance.

## VI.     RETALIATION

45.     Mr. Kendall has filed numerous grievances against the staff at FMC Devens in connection with the above mentioned events.  As a result, animosity brewed between certain FMC Devens personnel, including Defendant Tidwell, and Mr. Kendall.  Upon information and belief, Defendant Tidwell instructed correctional officers, including Defendant Flete, to make Mr. Kendall's life at FMC Devens difficult.

46.     On May 23, 2018, Mr. Kendall remained in his cell as he prepared to testify via videoconference before Judge Saris of the United States District Court for the District of Massachusetts.

47.     Prior to the hearing, Defendant Flete entered Mr. Kendall's cell to escort him to the videoconference room.  Mr. Kendall was laying out his paperwork to bring to the hearing and asked for an additional moment to collect his papers. Defendant Flete pushed all the papers to the ground. Mr. Kendall stated that he would file a grievance against Defendant Flete. In response,

Defendant Flete struck Mr. Kendall across the face with his hand, causing Mr. Kendall's already sunburnt skin to break, bleed, and release puss.

48. Shortly after Defendant Flete struck Mr. Kendall across the face, Mr. Kendall testified via videoconference before this Court and testified about the recent assault. Judge Saris took note of the assault allegations and inquired of Defendants Murray and Yeh what happened.

49. Immediately after the hearing, Defendant Taylor, a special investigative agent, interrogated Mr. Kendall in an attempt to force Mr. Kendall to recant his testimony regarding the assault committed by Defendant Flete. When Mr. Kendall refused, Defendant Taylor placed Mr. Kendall in the SHU and threatened to keep him there until Mr. Kendall recanted his allegations.

50. Defendants claimed they placed Mr. Kendall in the SHU for his own safety and as required by protocol when an FMC personnel assaults an inmate. However, when Mr. Kendall spoke with Lieutenant Greer, another investigative agent, he informed Mr. Kendall that there was no need to have placed Mr. Kendall in the SHU when Mr. Kendall did not fear for his life.

51. Ultimately, Mr. Kendall was placed in the SHU for over a month from May 23, 2018 until June 29, 2018. The SHU is not handicapped accessible and Mr. Kendall suffered several injuries and lacked adequate facilities to maintain his K-Pouch.

## VII.   DISABILITY DISCRIMINATION AND FAILURE TO ACCOMMODATE DISABILITY

52. In addition to the severe gastrointestinal issues Mr. Kendall has been dealing with since the 1980s, Mr. Kendall is further disabled as a result of at least the following ambulatory impairments:

      a)   An amputated left leg, requiring the use of a prosthetic;

      b)   A right total knee replacement;

      c)   A torn right quadriceps tendon;

    d)      Chronic right knee effusion; and

    e)      Chronic arthritis in numerous joints.

53.      Defendants have discriminated against Mr. Kendall on account of his disabilities, denying him the rights and privileges provided to able-bodied general population prisoners; have applied facially neutral policies that disparately affect Mr. Kendall because of his disability; and have refused to provide him with appropriate and reasonable accommodations.

54.      Defendants Tidwell, Kapatos, and Taylor have discriminated against Mr. Kendall on account of his disabilities, and have failed to accommodate Mr. Kendall's physical disabilities, by committing at least the following acts:

    a)      On or about January 10, 2018, Defendant Tidwell moved Mr. Kendall from a single, handicap accessible room to a double, non-handicap accessible room.

    b)      On or about January 10, 2018, Defendant Kapatos confiscated Mr. Kendall's new prosthetic leg, wheelchair, cane, and extendable arm

    c)      On May 23, 2018, Defendant Taylor moved Mr. Kendall into solitary confinement (SHU) where there are no handicapped facilities capable of meeting Mr. Kendall's severe medical needs.

    d)      Currently, Mr. Kendall lacks access to a handicapped bathroom that has a handrail next to the toilet, a sink within arm's reach of the toilet with running hot water, and a medical assisted device to help him safely ambulate.

55.      By depriving Mr. Kendall of his need for living quarters that can accommodate the maintenance of his severe medical conditions, including both the maintenance of his gastrointestinal issues and his severe ambulatory issues, despite FMC Devens having available

living quarters that potentially could accommodate Mr. Kendall, Defendants have discriminated against Mr. Kendall.

## COUNT I
## CRUEL AND UNUSUAL PUNISHMENT: DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEED (AGAINST DEFENDANTS BOP, MURRAY, YEH, SPAULDING, AND COUCH)

56.     Mr. Kendall repeats the allegations set forth in all previous paragraphs.

57.     The acts and omissions of Defendants Murray, Yeh, Spaulding, and Couch, including failing to provide adequate medical care for Mr. Kendall in light of his specific and peculiar medical needs, demonstrate deliberate indifference to Mr. Kendall's serious medical needs and constitute cruel and unusual punishment. The Defendants' acts and omissions have unlawfully deprived Mr. Kendall of the rights guaranteed to him by the Eighth and Fourteenth Amendments of the United States Constitution, and 42 U.S.C. § 1983.

58.     The acts and omissions of Defendants Murray, Yeh, and Couch, including failing to consult an outside specialist or gastroenterologist regarding treatment of Mr. Kendall's unresolved hematoma, demonstrate reckless and/or deliberate indifference to Mr. Kendall's serious medical needs, and constitute cruel and unusual punishment. The Defendants' acts and omissions have unlawfully deprived Mr. Kendall of the rights guaranteed to him by the Eighth and Fourteenth Amendments of the United States Constitution, and 42 U.S.C. § 1983.

59.     The acts and omissions of Defendant Spaulding, including failing to supervise the care provided to Mr. Kendall, failing to take action when Mr. Kendall filed grievances regarding his condition, and failing to ensure that the facility was capable and properly staffed to handle Mr. Kendall's medical issues, demonstrate deliberate indifference to Mr. Kendall's serious medical needs and constitute cruel and unusual punishment. Defendant Spaulding's behavior consisted of reckless and/or deliberate indifference to Mr. Kendall's welfare thereby unlawfully depriving Mr.

Kendall of the rights guaranteed to him by the Eighth and Fourteenth Amendments of the United States Constitution, and 42 U.S.C. § 1983.

60.     The customs and policies of Defendant BOP, including the custom and policy of refusing to provide Mr. Kendall with constitutional levels of medical care since at least June 2017, failing to provide adequate medical care for Mr. Kendall in light of his specific and peculiar medical needs, and failing to adhere to standard principals of the medical profession, have directly resulted in the unconstitutional care provided to Mr. Kendall.

**COUNT II**
**VIOLATION OF ARTICLE 26 OF THE CONSTITUTION OF THE COMMONWEALTH OF MASSACHUSETTS: DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEED (AGAINST DEFENDANTS BOP, MURRAY, YEH, SPAULDING, AND COUCH)**

61.     Mr. Kendall repeats the allegations set forth in all previous paragraphs.

62.     The acts and omissions of Defendants BOP, Murray, Yeh, Spaulding, and Couch, including failing to provide adequate medical care for Mr. Kendall in light of his specific and peculiar medical needs, demonstrate deliberate indifference to Mr. Kendall's serious medical needs and constitute cruel and unusual punishment. The Defendants' acts and omissions have unlawfully deprived Mr. Kendall of the rights guaranteed to him by Article 26 of the Declarations of Rights of the Constitution of the Commonwealth of Massachusetts, as enforceable through G.L. c. 12 § 11I.

63.     The acts and omissions of Defendants BOP, Murray, Yeh, and Couch, including failing to consult an outside specialist or gastroenterologist regarding treatment of Mr. Kendall's unresolved hematoma, demonstrate reckless and/or deliberate indifference to Mr. Kendall's serious medical needs, and constitute cruel and unusual punishment. The Defendants' acts and omissions have unlawfully deprived Mr. Kendall of the rights guaranteed to him by Article 26 of

the Declarations of Rights of the Constitution of the Commonwealth of Massachusetts, as enforceable through G.L. c. 12 § 11I.

64.     The acts and omissions of Defendant Spaulding, including failing to supervise the care provided to Mr. Kendall, failing to take action when Mr. Kendall filed grievances regarding his condition, and failing to ensure that the facility was capable and properly staffed to handle Mr. Kendall's medical issues, demonstrate deliberate indifference to Mr. Kendall's serious medical needs and constitute cruel and unusual punishment. Defendant Spaulding's behavior consisted of reckless and/or deliberate indifference to Mr. Kendall's welfare thereby unlawfully depriving Mr. Kendall of the rights guaranteed to him by Article 26 of the Declarations of Rights of the Constitution of the Commonwealth of Massachusetts, as enforceable through G.L. c. 12 § 11I.

**COUNT III**
**VIOLATION OF BOP'S DUTY OF SAFEKEEPING, CARE, AND SUBSISTENCE**
**(AGAINST DEFENDANT BOP)**

65.     Mr. Kendall repeats the allegations set forth in all previous paragraphs.

66.     The Administrative Procedure Act ("APA") grants the right to judicial review to any person "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of the relevant statute." 5 U.S.C. § 702.

67.     Defendant BOP is an agency as defined by the APA. 5 U.S.C. § 701(b)(1).

68.     Defendant BOP has the duty to "provide for the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States." 18 U.S.C. § 4042(a)(2).

69.     Defendant BOP has failed to properly provide for Mr. Kendall's safekeeping, care, and subsistence by ignoring his need for specialized medical care. Defendant has been indifferent to the specific, abnormal medical issues raised by Mr. Kendall's condition, resulting in Mr.

Kendall suffering severe, painful, and potentially irreversible aggravations to his already dire medical condition, which constitutes a failure by BOP to fulfill its statutory duties.

**COUNT IV**
**VIOLATION OF TITLE II OF THE AMERICANS WITH DISABILITIES ACT (ADA)**
**(AGAINST DEFENDANTS BOP, SPAULDING, KAPATOS, ANDERSON, AND TIDWELL)**

70.    Mr. Kendall repeats the allegations set forth in all previous paragraphs.

71.    Title II of the ADA prohibits a "public entity" from discriminating against a "qualified individual with a disability . . . by reason of such disability." 42 U.S.C. § 12132.

72.    Mr. Kendall is a qualified individual with a disability as defined by the ADA. 42 U.S.C. §§ 12131(2); 12102(1).

73.    Mr. Kendall, as an individual incarcerated by BOP, is otherwise qualified to access the services and benefits provided by BOP.

74.    Defendant BOP is a "public entity" under Title II of the ADA. 42 U.S.C. § 12131(1).

75.    Defendants Spaulding, Kapatos, Anderson, and Tidwell are sued under Title II in their official capacities.

76.    Defendants BOP, Spaulding, Kapatos, Anderson, and Tidwell have discriminated against Mr. Kendall on account of his disabilities, and have failed to provide reasonable accommodations so that he may access the services, programs, and activities available to the general prisoner population.

77.    The acts and omissions of Defendants BOP, Spaulding, Kapatos, Anderson, and Tidwell, including failing to provide adequate assistance and conditions to allow for Mr. Kendall to move around his room and the facility have discriminated against Mr. Kendall by failing to

provide reasonable accommodation, and restricting his access to the services, programs, and activities that are available to the general prisoner population.

78.     The acts and omissions of Defendants BOP, Spaulding, and Tidwell, including removing Mr. Kendall to a non-handicapped cell that does not allow for Mr. Kendall to properly navigate his room or toilet have discriminated against Mr. Kendall by failing to provide reasonable accommodation, and restricting his access to the services, programs, and activities that are available to the general prisoner population.

**COUNT V**
**VIOLATION OF ARTICLE 114 OF THE CONSTITUTION OF THE COMMONWEALTH OF MASSACHUSETTS (AGAINST DEFENDANTS SPAULDING, KAPATOS, ANDERSON, AND TIDWELL)**

79.     Mr. Kendall repeats the allegations set forth in all previous paragraphs.

80.     Article 114 of the Constitution of the Commonwealth of Massachusetts provides that no "otherwise qualified handicapped individual" may be discriminated against, by reason of their handicap, in "any program or activity within the Commonwealth."

81.     Mr. Kendall is a handicapped individual, who is qualified to access the services and benefits provided by the BOP.

82.     Defendants Spaulding, Kapatos, Anderson, and Tidwell are sued, in their individual capacity, under Article 114 and G.L c. 93, § 103.

83.     Defendants Spaulding, Kapatos, Anderson, and Tidwell have discriminated against Mr. Kendall by failing to provide reasonable accommodations, so that Mr. Kendall may enjoy the benefits available to the general population.

84.     Defendants Spaulding, Kapatos, Anderson, and Tidwell have deprived Mr. Kendall of his right to be free from discrimination on the basis of disability, in violation of Article 114 as enforceable by G.L. c. 93, § 103, and G.L. c. 12, § 11I.

## COUNT VI
## VIOLATION OF THE REHABILITATION ACT (AGAINST DEFENDANT BOP)

85.     Mr. Kendall repeats the allegations set forth in all previous paragraphs.

86.     The Rehabilitation Act prohibits federally funded programs from "den[ying] the benefits of, or . . . subject[ing] to discrimination" an "otherwise qualified individual with a disability." 29 U.S.C. § 794(a).

87.     Mr. Kendall is a qualified individual with a disability. 29 U.S.C. § 794.

88.     Defendant BOP is a recipient of federal funding within the meaning of the Rehabilitation Act. 29 U.S.C. § 794.

89.     Defendant BOP has discriminated against Mr. Kendall on account of his disabilities, and has failed to provide reasonable accommodations so that he may access the services, programs, and activities available to the general prisoner population and thereby has deprived Mr. Kendall of his right to be free from discrimination on the basis of disability as guaranteed by Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a).

## COUNT VII
## CRUEL AND UNUSUAL PUNISHMENT: CONDITIONS OF CONFINEMENT
## (AGAINST DEFENDANTS BOP, SPAULDING, MURRAY, YEH, KAPATOS,
## ANDERSON, COUCH, FLETE, TAYLOR, AND TIDWELL)

90.     Mr. Kendall repeats the allegations set forth in all previous paragraphs.

91.     Defendants BOP, Spaulding, Murray, Yeh, Kapatos, Anderson, Couch, Flete, Taylor, and Tidwell have held, and continue to hold, Mr. Kendall in conditions that deny him the minimal measure of necessities required for civilized living. This includes the provision of inadequate facilities with which to empty feces from his K-Pouch, inadequate accommodations to allow Mr. Kendall to move about his cell, and unnecessarily retaliation against Mr. Kendall that cause Mr. Kendall to be fearful of further reprisals.

92.     The actions of Defendants BOP, Spaulding, Murray, Yeh, Kapatos, Anderson, Couch, Flete, Taylor, and Tidwell demonstrate deliberate indifference to Mr. Kendall's health, safety and welfare, and unlawfully deprive Mr. Kendall of the rights guaranteed to him by the Eighth and Fourteenth Amendments of the United States Constitution, and 42 U.S.C. § 1983.

## COUNT VIII
## VIOLATION OF FIRST AMENDMENT RIGHTS: GRIEVANCE RETALIATION
## (AGAINST DEFENDANTS BOP, SPAULDING, FLETE, TAYLOR, AND TIDWELL)

93.     Mr. Kendall repeats the allegations set forth in all previous paragraphs.

94.     Mr. Kendall filed a complaint with, and requested a hearing from, the United States District Court for the District of Massachusetts in order to seek relief from Defendants violations of Mr. Kendall's state and federal constitutional and statutory rights.  After stating that he would file a grievance against Defendant Flete for shoving his papers to the floor, Defendant Flete retaliated against Mr. Kendall and backhanded Mr. Kendall across the face. This retaliation unlawfully deprives Mr. Kendall of the rights to freedom of speech and freedom to "petition the Government for a redress of grievances," as guaranteed by the First Amendment and 42 U.S.C. § 1983.

95.     Defendants BOP, Spaulding, Flete, Taylor, and Tidwell further retaliated against Mr. Kendall by confining him to the SHU. This unlawfully deprives Mr. Kendall of the rights to freedom of speech and freedom to "petition the Government for a redress of grievances," as guaranteed by the First Amendment and 42 U.S.C. § 1983.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

1) Grant judgment in Mr. Kendall's favor on all counts of the complaint;

2) Declare that Defendants have violated Mr. Kendall's rights under the constitution, and federal and state laws described herein;

3) Preliminarily and permanently enjoin the Defendants from denying adequate medical care, specifically:

    a) Enjoin Defendants from failing to provide Mr. Kendall the appropriate standard of care to treat Mr. Kendall's hematoma by ordering Defendants to arrange a consult for Mr. Kendall with an outside specialist, namely a colorectal surgeon and/or gastroenterologist, concerning the treatment of Mr. Kendall's hematoma;

    b) Enjoin Defendants from failing to provide adequate ambulatory assistance to Mr. Kendall;

4) Permanently enjoin the Defendants from discriminating against Mr. Kendall because of his disabilities;

5) Permanently enjoin the Defendants from retaliating against Mr. Kendall's exercise of constitutionally protected speech;

6) Award Mr. Kendall damages, reasonable attorney's fees, costs, and interest, as allowed by law; and

7) Grant Mr. Kendall such other relief as the Court deems just.

## JURY DEMAND

Mr. Kendall demands a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated:  July 20, 2018     Respectfully submitted,

          **STEVEN N. KENDALL**

          By his attorneys,

          */s/ Susan M. Finegan*
          Susan M. Finegan, BBO # 559156
          Matthew C. Hurley, BBO # 643638
          Julia M. Ong, BBO # 685014
          Daniel B. Weinger, BBO # 681770
          MINTZ, LEVIN, COHN, FERRIS,
           GLOVSKY AND POPEO, P.C.
          One Financial Center
          Boston, Massachusetts 02111
          Telephone: (617) 542-6000
          Facsimile: (617) 542-2241
          SMFinegan@mintz.com
          MCHurley@mintz.com
          JMOng@mintz.com
          DBWeinger@mintz.com

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants, if any, on July 20, 2018.

          */s/ Susan M. Finegan*

79215239v.11